IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LANCE L. PARKER, | |
| Plaintiff, | |
| v. | Civil Action No. 22-1317-CFC |
| ROY HENRY, BRENDIN MOTE, ERNEST EBWELLE, JOHN DOE 1, JOHN DOE 2, TIM DOLAN, and TANISHA LAFAYETTE, | |
| Defendants. | |

Lance L. Parker, James T. Vaughn Correctional Center, Smyrna, Delaware
– *Pro se* Plaintiff

James D. Taylor, Jr., SAUL EWING ARNSTEIN & LEHR LLP, Wilmington, Delaware; Lorin Huerta, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware

>    *Counsel for Defendants Roy Henry, Brendin Mote, Ernest Ebwelle, John Doe 1, and John Doe 2*

Brett T. Norton and Dawn C. Doherty, MARKS, O'NEILL, O'BRIEN DOHERTY & KELLY, P.C., Wilmington, Delaware

>    *Counsel for Defendants Tim Dolan and Tanisha Lafayette*

**<u>MEMORANDUM OPINION</u>**

March 4, 2026
Wilmington, Delaware

COLM F. CONNOLLY
CHIEF JUDGE

Defendants Roy Henry, Brendin Mote, Ernest Ebwelle, John Doe 1, and John Doe 2 (collectively, the Delaware Department of Correction (DOC) Defendants), and Tim Dolan, PA and Tanisha Lafayette, NP (collectively, the Medical Defendants) have moved for summary judgment on *pro se* Plaintiff Lance L. Parker's claims for damages and injunctive relief under 42 U.S.C. § 1983. D.I. 72 (DOC Defendants); D.I. 76 (Medical Defendants).[1]  DOC Defendants are correctional officers at James T. Vaughn Correctional Center (JTVCC), and Medical Defendants are medical personnel at JTVCC who treated Parker for injuries he suffered there.  Parker bases his § 1983 claims on alleged violations of the Eighth Amendment of the U.S. Constitution.[2]  For the reasons discussed below, I will grant Defendants' motions.

---

[1] The Amended Complaint contains allegations against other individuals, but on June 20, 2023, the Court issued an order dismissing all claims against all the other defendants. *See* D.I. 22 at 1.  DOC Defendants and Medical Defendants are thus the only remaining defendants in this case.

[2] The Eighth Amendment's prohibition on cruel and unusual punishment applies to the states via the Due Process Clause of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 667 (1962).

## I.    BACKGROUND

### A.    The Amended Complaint

The operative Amended Complaint alleges that on April 25, 2022, Parker suffered an injury to his left ankle while playing basketball at JTVCC. D.I. 14 at 10. He alleges that he requested immediate medical attention from Henry and Mote, but both officers denied him immediate treatment and told him to put in "a sick call" (a form JTVCC inmates can fill out to request medical attention and/or to go to the infirmary, *see* D.I. 74-1 at 29:9–30:6). D.I. 14 at 10. Parker alleges that he was not permitted to go to the infirmary until two days later, on April 27, 2022. D.I. 14 at 11.

Parker alleges that DOC Defendants further delayed his medical treatment by failing to provide him crutches for two months, transferring him to a cell without access to a handicap-accessible shower, and later refusing to fix his "faulty" crutches. D.I. 14 at 11–15. He alleges that these experiences caused him to sustain further injuries and suffer mental health issues. D.I. 14 at 12–13. Parker alleges that, as a result, he sought mental health treatment but that this treatment, too, was repeatedly delayed. D.I. 14 at 13–14. With respect to Medical Defendants, Parker alleges that they provided him with inadequate medical care and delayed his treatment. D.I. 14 at 13, 16.

Parker seeks compensatory and punitive damages and injunctive relief.

D.I. 14 at 17.

**B.     Evidence of Record**

Parker is an inmate at JTVCC. *See* D.I. 74-1 at 8:6–9. On April 25, 2022,

Parker injured his ankle when he fell while playing one-on-one basketball.

D.I. 74-1 at 38:4–22. Parker asked Henry, who witnessed Parker's fall, if he could

go to the infirmary for his ankle, D.I. 74-1 at 43:14–16, 44:10–16, and Henry

replied that Parker should put in a sick call because he just rolled his ankle,

D.I. 74-1 at 45:8–16. Once Parker returned to his cell, he also asked Mote and

later Ebwelle to go to the infirmary for his ankle, and they, too, told him to put in a

sick call. D.I. 74-1 at 47:16–48:19. Parker did not put in a sick call that day. *See*

D.I. 74-1 at 52:18–53:3, 55:2–8, 55:13–17.

Parker put in a sick call the next day, April 26, and was seen by medical

personnel in the infirmary on April 27, which Parker agreed was "a pretty typical

. . . turnaround." D.I. 74-1 at 55:13–56:2. The infirmary referred Parker to a

hospital, D.I. 74-1 at 62:14–16, where Parker's ankle was x-rayed and he received

an air boot for his ankle, D.I. 74-1 at 64:2–14, 66:7–8. Parker was also offered

crutches and a wheelchair at the hospital, but John Doe 1 and John Doe 2 declined

them, stating that JTVCC could supply Parker with them upon his return.

D.I. 74-1 at 66:9–14. Parker instead received an ACE bandage and Motrin when he returned to JTVCC. D.I. 74-1 at 65:24–66:3.

Parker was seen by Dr. Jennifer G. Erskine upon returning to JTVCC. D.I. 68-1 at 104. She reviewed the records from Parker's hospital visit and "spoke with [the] charge nurse there who advised of discharge recommendations." D.I. 68-1 at 104. She referred Parker to physical therapy and orthopedics, requested an MRI, ordered that he be given a bottom bunk, and told him to rest and ice his ankle. D.I. 68-1 at 104. She also determined that Parker was "[s]table for discharge from [the] infirmary and [to] return to regular housing." D.I. 68-1 at 104. One week later, on May 6, Parker was seen for a follow-up appointment with Ihuoma Chuks, NP. D.I. 68-1 at 103. Chuks suggested that Parker try taking Flexeril and Ibuprofen, ordered him to follow up in one month and to let medical personnel know if his symptoms worsened, and once again referred him to physical therapy. D.I. 68-1 at 103. Parker filed a grievance complaining of his medical treatment and lack of a walking aid on May 30. D.I. 74-2 at 1.

Parker testified in his deposition that he had "coincidental[ly]" been placed in a handicap-accessible tier at JTVCC prior to his injury "[b]ecause that was the open cell." D.I. 74-1 at 61:1–10, 67:23–68:9. He used the ramp and chair available in the handicap-accessible shower to take his air boot on and off to shower. D.I. 74-1 at 67:23–68:4. "[O]n or around June 10, 2022," however,

4

Ebwelle transferred Parker to a different tier because of "a disagreement" with Parker. D.I. 74-1 at 68:10–14, 69:4–14. Parker testified that he could not recall the subject of their disagreement. D.I. 74-1 at 69:19–21. Sometime thereafter, Parker slipped trying to get into the non-handicap-accessible shower and injured his wrist and shoulder. D.I. 74-1 at 75:3–15. He did not seek medical treatment for those injuries. D.I. 74-1 at 75:16–18.

On June 8, Parker was seen by a nurse and evaluated by a physical therapist, Mary G. Doyle. D.I. 68-1 at 99–100. Doyle led Parker through some exercises and requested that Parker be given a heel lift and access to a handicap-accessible shower for six months. D.I. 68-1 at 100. Doyle's request was accompanied by the following remark in Parker's medical records: "[Parker] notes he recently moved tiers and no longer has access to [a] handicap[ped] shower. [Parker] reports having difficulty stabilizing on [his] left foot when stepping over [the] wall in [the] regular shower. [Parker] reports [a] fear of falling when stepping and when in [the] shower." D.I. 68-1 at 99. Parker was transferred back to the handicap-accessible tier within a "couple days." D.I. 74-1 at 94:14–95:4. Doyle also determined that Parker should "be seen [for physical therapy] weekly for 2-4 weeks then biweekly." D.I. 68-1 at 100.

On June 15, Parker received an MRI, which revealed that Parker's ankle was neither fractured nor dislocated but that there was "[m]ild attenuation of the

anterior talofibular ligament." D.I. 68-1 at 89; *see also* D.I. 74-2 at 9. No later than June 16, Dolan, a physician's assistant, requested crutches for Parker, D.I. 68-1 at 94; *see also* D.I. 74-2 at 9, and Doyle gave the crutches to Parker on June 29, D.I. 68-1 at 94. On June 30, Parker saw Lafayette, a nurse practitioner, who ordered Tylenol and another x-ray for Parker's ankle and encouraged Parker to "[c]ontinue with [the] current plan of care" and "follow up with a sick call" "if [his] symptoms persist or worsen." D.I. 68-1 at 91–92.

Parker continued to see medical personnel and his physical therapist in July. *See* D.I. 68-1 at 86–89. On July 12, Dolan instructed Parker to continue physical therapy and take Prednisone for five days, and once again referred Parker to orthopedics. D.I. 68-1 at 88–90. Later that month, Parker saw an offsite orthopedist, who gave Parker an ankle brace to wear instead of the air boot and recommended that Parker see a neurologist for possible complex regional pain syndrome. *See* D.I. 68-1 at 86. Dr. Erskine once again saw Parker upon his return from the offsite doctor's visit. *See* D.I. 68-1 at 86.

On August 1, Parker saw a nurse practitioner, Flora A. Atangcho. D.I. 68-1 at 84. Atangcho re-ordered the medications that Parker had been prescribed, submitted the neurology referral that the offsite orthopedist had recommended, and encouraged Parker to continue physical therapy and use the ankle brace. D.I. 68-1 at 85. Parker was seen by medical personnel again on August 19. D.I. 68-1 at 81.

On August 24, Parker saw Dolan again, and Dolan prescribed Parker additional medications to manage his pain, recommended Vitamins C and B12, and instructed him to continue physical therapy and follow up as needed. *See* D.I. 68-1 at 78–79. Parker continued physical therapy with Doyle, seeing her on at least August 1, 10, 17, 24, and 29. *See* D.I. 68-1 at 76, 78, 82, 84.

In August, Parker had also requested treatment for some mental health issues. *See* D.I. 74-1 at 79:18–24, 81:13–20. On August 25, Parker asked Ebwelle if he could be seen by mental health professionals for an emergency, and Ebwelle told him to put in a sick call. D.I. 74-1 at 81:13–13. JTVCC also uses sick call for mental health treatment, and according to Parker, mental health professionals typically respond to relevant sick calls within a day or two. *See* D.I. 74-1 at 31:11–32:6. Medical records indicate that mental health professionals attempted to visit Parker on at least two different days that month but were unable to meet with him because he was unavailable. *See* D.I. 68-1 at 80–81. Parker testified that mental health staff lied about attempting to visit him, D.I. 74-1 at 79:21–80:14, but that he "end[ed] up being seen by mental health" "either the next day [after he requested help] or the day after that," D.I. 74-1 at 82:14–17. When asked how many mental health visits he had from April to December 2022, Parker replied that it was "too many to count." D.I. 74-1 at 80:15–19.

In September, Parker fell while using his crutches because the "crutches had been re-adjusted improperly by [Parker] which caused the crutches to fold when used." *See* D.I. 74-1 at 90:10–17; D.I. 74-3. Parker put in a sick call and was seen by a nurse and his physical therapist, who "re-educated" him on how to use and adjust the crutches properly. *See* D.I. 74-1 at 91:17–21; D.I. 74-3.

Medical records indicate that Parker continued to see onsite medical personnel and his physical therapist through at least June 2023. *See* D.I. 74-4; D.I. 74-5; D.I. 74-6; D.I. 74-7. As of April 19, 2023, "[Parker] [had] report[ed] 'playing basketball all day'" to his physical therapist, D.I. 74-5, and as of June 28, 2023, "[Parker] [had] report[ed] [that] he is doing well and playing basketball and able to go to work," D.I. 74-7.

## II.    LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the burden of persuasion at trial would be on the nonmoving party, then the moving party may satisfy its burden of production by pointing to an absence of evidence supporting the nonmoving party's case, after which the burden of production then shifts to the nonmovant to demonstrate the

existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989).

Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). "[A] dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.* (internal quotation marks omitted). A nonmoving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the moving party] do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). The nonmoving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460–61.

The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). "[T]he facts asserted by the nonmoving party, if supported by affidavits or other evidentiary material, must be

regarded as true." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996).

## III.  DISCUSSION

### A.    Medical Defendants

Medical Defendants argue that I should grant them summary judgment because Parker fails to set forth a cognizable claim of deliberate indifference.[3] D.I. 77 at 13.  Their motion appears to be unopposed,[4] but I still must address the motion on its merits.  *See Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir. 1990) ("[Failure to respond to a summary judgment motion] is not alone a sufficient basis for the entry of a summary judgment.  There must, in addition, be a finding that judgment for the moving party is 'appropriate.'").

Because I agree that no reasonable jury could find that Parker's medical care was inadequate or that Medical Defendants were deliberately indifferent to Parker's

---

[3] Medical Defendants also argue in their opening brief that Parker failed to exhaust all administrative remedies prior to filing this suit.  D.I. 77 at 10.  In their reply brief, however, Medical Defendants seem to abandon this argument, stating that "on further review, it appears Plaintiff did submit and *potentially* exhaust at least one grievance relating to the subject injury."  D.I. 83 at 1 (emphasis in the original).  I thus will not, and need not, address that argument here.

[4] Parker's opposition (D.I. 81) appears to respond only to DOC Defendants' Motion for Summary Judgment, based on his outline of arguments (which mirrors the arguments DOC Defendants raise in their opening brief in support of their motion) and his request in the conclusion that I "Dismiss the DOC Defendants' Motion for Summary Judgment."  *See* D.I. 81 at 1, 5.

medical needs based on the record evidence, I will grant Medical Defendants' motion.

The Eighth Amendment's prohibition against cruel and unusual punishment requires prisons to provide medical care to inmates. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). To set forth a cognizable claim of deliberate indifference, an inmate must allege (1) a serious medical need and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. *Estelle*, 429 U.S. at 106; *see also Rouse*, 182 F.3d at 197. There are two types of deliberate indifference claims: adequacy of care claims and delay or denial of treatment claims. *See Pearson v. Prison Health Serv.*, 850 F.3d 526, 537 (3d Cir. 2017). Because Parker appears to allege both types of claims against Medical Defendants, I will address each in turn.

First, "there are two very distinct subcomponents to the deliberate indifference prong of an adequacy of care claim." *Pearson*, 850 F.3d at 536. "The first is the adequacy of the medical care—an objective inquiry." *Id.* And "[t]he second is the individual defendant's state of mind—a subjective inquiry that can be proven circumstantially." *Id.* Accordingly, a prison official is deliberately indifferent if he subjectively knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

"[A] prisoner does not have the right 'to choose a specific form of medical treatment,'" so long as the treatment provided is objectively reasonable. *Lasko v. Watts*, 373 F. App'x 196, 203 (3d Cir. 2010) (quoting *Harrison v. Barkley*, 219 F.3d 132, 138–40 (2d Cir. 2000)). "[M]ere disagreement as to the proper medical treatment" is thus insufficient to state a claim under the Eighth Amendment. *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (alteration in the original) (citation omitted). "[W]hen medical care is provided, [the Court] presume[s] that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." *Pearson*, 850 F.3d at 535. An inmate's claims against prison officials are thus not viable where the inmate receives continuing care but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *See Estelle*, 429 U.S. at 107.

Here, no reasonable jury could conclude that Medical Defendants provided Parker inadequate medical care. The evidence of record overwhelmingly suggests that Parker received extensive and continuing medical care. Lafayette, Dolan, and their colleagues saw Parker frequently from April 2022 to at least June 2023. *See, e.g.*, D.I. 68-1 at 78–79, 85–89, 91–92, 99–100, 103–04; D.I. 74-3; D.I. 74-4; D.I. 74-5; D.I. 74-6; D.I. 74-7. Parker saw offsite healthcare providers, including an orthopedic specialist, on at least two occasions. *See* D.I. 74-1 at 62:14–16,

64:2–14; D.I. 68-1 at 86. Medical Defendants and their colleagues prescribed Parker medication to manage his pain, ordered additional tests (including at least an MRI and a second x-ray) and appointments with specialists, and gave him equipment to facilitate his recovery (including at least crutches and a heel lift). *See* D.I. 68-1 at 88–92, 94, 100, 103. Parker also regularly completed physical therapy at the prison for much of this time period. *See, e.g.*, D.I. 68-1 at 76, 78, 82, 84, 86–89, 94, 99–100; D.I. 74-3; D.I. 74-4; D.I. 74-5; D.I. 74-6; D.I. 74-7.

Parker offers no evidence whatsoever to suggest that such treatment violated professional standards of care and was thus unreasonable. Rather, Parker's claim appears to reflect "mere disagreement as to the proper medical treatment." *See Spruill*, 372 F.3d at 235. Indeed, when asked at his deposition to explain his claims against Medical Defendants, Parker merely stated that he felt like "they dropped the ball." D.I. 74-1 at 111:3–21. Accordingly, I will grant Medical Defendants' motion insofar as it seeks entry of summary judgment on Parker's adequacy of care claim.

Parker's delay or denial of treatment claim against Medical Defendants fares no better. A prison official may also manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle*, 429 U.S. at 104–05. A delay or denial of medical treatment claim is different than an adequacy of care claim. *See Pearson*, 850 F.3d at 537. "Unlike the deliberate

indifference prong of an adequacy of care claim (which involves both an objective and subjective inquiry), the deliberate indifference prong of a delay or denial of medical treatment claim involves only one subjective inquiry." *Id.* "All that is needed [to survive a motion for summary judgment on deliberate indifference of a delay or denial of treatment claim] is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors." *Id.*

No reasonable jury could find that Medical Defendants intentionally denied or delayed Parker's medical care. As a preliminary matter, there is no evidence that medical care for his ankle was, in fact, delayed. To the contrary, Parker testified that he was seen by medical personnel within a day of putting in a sick call, and that this response time was on par with prior sick calls he had placed. *See* D.I. 74-1 at 55:13–56:2; *see also* D.I. 74-1 at 30:15–31:2. And Parker was seen by medical personnel at JTVCC over a dozen times from April to September 2022. Moreover, the medical records entered by Medical Defendants provide that Parker shall return for follow-up care—i.e., they encouraged him to continue receiving medical treatment. *See, e.g.*, D.I. 68-1 at 78–79, 91–92.

Parker places a lot of stock in the fact that he did not receive crutches for several weeks following his injury, *see* D.I. 81 at 2–4, but "a prisoner does not have the right 'to choose a specific form of medical treatment,'" *Lasko*, 373

F. App'x at 203. And for the reasons described above, the treatment that Parker *was* receiving was adequate: Parker's ankle was protected in an air boot, and he received medication to manage his pain and physical therapy to rehabilitate his ankle. More importantly, Parker offers no evidence that Medical Defendants subjectively appreciated—and disregarded—a substantial risk to Parker's health by not immediately giving him crutches. I will thus grant Medical Defendants' motion insofar as it seeks entry of summary judgment on Parker's delay or denial of treatment claim.

### B.    DOC Defendants

DOC Defendants argue that they are entitled to summary judgment for several reasons. *See* D.I. 73 at 1–2. I need only address their argument that they were not deliberately indifferent to Parker's injury as a matter of law.

Parker opposed DOC Defendants' motion for summary judgment. D.I. 81. His opposition, however, consists solely of argument and is not signed under penalty of perjury or accompanied by a sworn affidavit. The opposition does not cite to the record and does not provide any supporting evidence for my consideration. Parker, as the nonmoving party, cannot simply assert factually unsupported allegations to meet his burden at the summary judgment stage. *See Williams*, 891 F.2d at 460.

DOC Defendants also argue that John Doe 1 and John Doe 2 should be dismissed pursuant to Federal Rule of Civil Procedure 21 because Parker has failed to identify them. D.I. 73 at 18. Parker concedes that he has failed to identify John Doe 1 and John Doe 2 and agrees to their dismissal, D.I. 81 at 5, so I will grant DOC Defendants' motion insofar as it seeks the dismissal of John Doe 1 and John Doe 2. That leaves Henry, Mote, and Ebwelle of the DOC Defendants.

Parker's principal allegation against Henry, Mote, and Ebwelle is that they delayed and/or denied him medical treatment for his ankle injury. *See* D.I. 14 at 10–15. As described above, a delay or denial of treatment claim is different than an adequacy of care claim. *See Pearson*, 850 F.3d at 537. And "[a]ll that is needed [to survive summary judgment on deliberate indifference for a delay or denial of treatment claim] is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors." *Id.*

Parker primarily takes issue with the fact that Henry, Mote, and Ebwelle each instructed him to put in a sick call the day he sustained his ankle injury instead of permitting him to go straight to the infirmary. *See* D.I. 81 at 2–4. Parker, however, offers no evidence to suggest that Henry, Mote, or Ebwelle subjectively appreciated a substantial risk to Parker's health and intended to delay Parker's medical care for nonmedical reasons by directing him to put in a sick call.

16

Rather, Parker testified in his deposition at length that sick call is the normal procedure by which JTVCC—and other prisons, for that matter—processes inmate requests for medical attention. *See* D.I. 74-1 at 28:10–32:9. And no reasonable jury could conclude that Parker's condition—an ankle injury sustained playing basketball—"was so dire and obvious that [Henry, Mote, and Ebwelle's] failure to summon immediate medical attention . . . amounted to deliberate indifference." *See Spruill*, 372 F.3d at 237.

To the extent Parker claims that Henry, Mote, or Ebwelle delayed the mental health treatment he sought in August 2022, that claim fails for many of the same reasons. Here, too, Parker's treatment may not be fairly characterized as "delayed." Parker testified that he received treatment within one to two days of requesting it, D.I. 74-1 at 82:14–17, and that mental health professionals at JTVCC typically respond to relevant sick calls (the normal process) within a day or two, *see* D.I. 74-1 at 31:11–32:6. Parker does not offer any evidence that Ebwelle directed him to put in a mental health sick call for an impermissible reason. And because sick call is the normal process by which inmates request mental health treatment, Ebwelle's direction, without more, is not sufficient to permit a reasonable jury to find that he was deliberately indifferent.

To the extent Parker claims that Henry, Mote, or Ebwelle is somehow responsible for the time it took medical personnel to provide him with crutches,

Parker's claim fails for the same reasons discussed above with respect to the Medical Defendants. There is no evidence that any Defendant was subjectively aware of—and disregarded—a substantial risk. Rather, it would have been readily apparent that Parker was already being treated by medical personnel for his injury because he wore an air boot on his left foot.

Ebwelle's decision to transfer Parker away from the handicap-accessible shower in June 2022 is a closer call. Parker testified that Ebwelle transferred him because of a disagreement they had (i.e., for a nonmedical reason), *see* D.I. 74-1 at 68:10–14, 69:4–14, and Parker's testimony is unrebutted. The circumstances surrounding Parker's transfer, however, are insufficient to create a triable issue as to whether Ebwelle was deliberately indifferent to Parker's medical needs. It was "purely coincidental" that Parker was on the handicap-accessible tier in the first place—i.e., he was on the tier *before* he sustained his injury, and his presence there was not originally part of his medical care for his ankle. *See* D.I. 74-1 at 61:1–10, 67:23–68:9; *see also* D.I. 68-1 at 104. Not until *after* Ebwelle transferred Parker and Parker complained to his physical therapist about his transfer did his physical therapist request that Parker be given access to an accessible shower in light of his injury (and his complaint to her). *See* D.I. 68-1 at 99–100. (And Parker was returned to the handicap-accessible tier within a "couple days." D.I. 74-1 at 94:14–95:4) Absent evidence that Ebwelle knew, for example, that there was a

18

high probability that Parker would fall and further injure himself in the non-handicap-accessible shower or that an accessible shower was a critical component of Parker's medical care (it was not), no reasonable jury could conclude that he subjectively knew and disregarded a substantial risk to Parker's health when he transferred him. Accordingly, I will grant DOC Defendants' motion insofar as it seeks entry of summary judgment on Parker's delay or denial of treatment claim.

To the extent Parker alleges that Henry, Mote, and Ebwelle provided him with inadequate medical care, Parker's claim also fails. "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference" in an adequacy of care claim. *See Spruill*, 372 F.3d at 236 (upholding the dismissal at the motion-to-dismiss stage of adequacy of care claims against nonphysician defendants); *see also Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993) (holding that nonphysicians cannot "be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor"). And Parker offers no evidence that Henry, Mote, or Ebwelle believed or had reason to believe that medical personnel were mistreating or failing to treat him. To the contrary, Parker testified

19

that he wore an air boot (and later an ankle brace) on his left foot, used crutches, and took pain medication in the months following his injury—all of which suggests to a prison official that Parker was actively receiving reasonable medical treatment. I will thus grant DOC Defendants' motion insofar as it seeks entry of summary judgment on Parker's adequacy of medical care claim.

## IV.    CONCLUSION

For the foregoing reasons, I will grant Defendants' motions for summary judgment. The Court will issue an Order consistent with this Memorandum Opinion.